**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
——————————————————————x

**UNITED STATES OF AMERICA,**


     **-v-**
                                          **Case No.      20-CR-626 (PMH)**

**CASWELL SENIOR,**

         **Defendant.**
——————————————————————x


## DEFENDANT'S MOTION FOR BOND
## IN SUPPORT OF BAIL PENDING TRIAL



James Kousouros
260 Madison Avenue, 22nd Floor
New York, New York 10016
Tel: (212) 532-1934
Fax: (212) 532-1939
James@kousouroslaw.com
*Attorney for Mr. Senior*

## **TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................................2

TABLE OF AUTHORITIES..........................................................................................................3

LIST OF EXHIBITS ......................................................................................................................4

PRELIMINARY STATEMENT .....................................................................................................5

THE LAW ON PRE-TRIAL DETENTION ..................................................................................6

    Risk of flight ............................................................................................................................9

    Danger to the Community......................................................................................................10

    Personal History....................................................................................................................11

    The health threat posed by the COVID-19 pandemic and its effect on Mr. Senior's ability to
    prepare for trial warrants his temporary release. ................................................................12

CONCLUSION ............................................................................................................................21

## **TABLE OF AUTHORITIES**

**Cases**

Benjamin v. Fraser, 264 F.3d 175 (2d Cir. 2001)...................................................................14

Falcon v. U.S. Bureau of Prisons, 52 F.3d 137 (7th Cir. 1995) .....................................15

Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons, No. 19-1778, 2020 WL 1320886  (2d
   Cir. March 20, 2020)...........................................................................................14

Stack v. Boyle, 342 U.S. 1 (1951) ......................................................................................6

United States v. Chimurenga, 760 F.2d 400 (2d Cir. 1985) ............................................7

United States v. Hudson, 19-CR-496 (CM) (Mar. 13, 2020) ..........................................14

United States v. Jamel McTier, 17-cr-557 (FB) ..............................................................8

United States v. Montalvo-Murillo, 495 U.S. 711 (1990) ...............................................6

United States v. Paulino, 335 F. Supp. 3d 600 (2018) ...........................................6, 7, 8

United States v. Perez, 19-CR-297 (PAE) (Mar. 19, 2020) ...........................................14

United States v. Sabhnani, 493 F.3d 63 (2d Cir. 2007) ..................................................7

United States v. Salerno, 481 U.S. 739 (1987)..........................................................6, 7

United States v. Scarpa, 815 F. Supp. 88 (1993) ...........................................................6

United States v. Shakur, 817 F.2d 189 (2d Cir. 1987) ...................................................7

United States v. Stephens, 15-CR-95 (AJN) (Mar. 19, 2020) .......................................14

**Statutes**

18 U.S.C. § 3142 ..........................................................................................................5, 6

18 U.S.C. § 3142 (b)(1)(c)..............................................................................................7

18 U.S.C. § 3142 (g)........................................................................................................7

18 U.S.C. § 3142 (g)(4)...................................................................................................7

18 U.S.C. § 3142(c)(b)(i)...............................................................................................15

18 U.S.C. § 3142(i).......................................................................................................15

18 U.S.C. § 924(c)(1)(A) .................................................................................................5

21 U.S.C. § 841(a)(1) ......................................................................................................5

## <u>LIST OF EXHIBITS</u>

**Exhibit A:**    Indictment

**Exhibit B:**    Government Detention Memo dated December 1, 2020

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
———————————————————————x

**UNITED STATES OF AMERICA,**


      -v-                               **Case No.**      **20-CR- 626 (PMH)**

**CASELL SENIOR,**

              **Defendant.**
———————————————————————x


## PRELIMINARY STATEMENT

Defendant Caswell Senior submits this Memorandum of Law in support of his application for pre-trial release on conditions pursuant to 18 U.S.C. § 3142. On or about December 2, 2020, Caswell Senior voluntarily surrendered to federal authorities, in the presence of counsel, and was arrested on a sealed Indictment in which he has been charged with Racketeering Conspiracy (Count One), a violation of 21 U.S.C. § 841(a)(1) – conspiracy to knowingly and intentionally manufacture distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance, to wit, crack cocaine, cocaine and marijuana (Count 13) and in (Count 14), Possession of a Firearm in Furtherance of a Drug Trafficking Crime pursuant to 18 U.S.C. § 924(c)(1)(A) and 2. (*See* Indictment, **Exhibit A**). An initial appearance was conducted before the Honorable Andrew E. Krause, United States Magistrate Judge on December 3, 2020 after which Mr. Senior was detained on consent, without prejudice to submit a bail application at a later time.

We have secured a substantial bail package for the Court's consideration and respectfully submit that when the facts herein are considered in a more informed and accurate context and in conjunction with the remaining statutory factors, Mr. Senior emerges as a viable candidate for release on a significant bond with strict pre-trial conditions. Mr. Senior is not a flight risk by any measure and notwithstanding the generalized allegations in the Indictment as to danger, Mr. Senior is not a danger to the community such that conditions of bail cannot be properly constructed and administered.

Moreover, in light of the COVID-19 pandemic which has invaded our prisons, Mr. Senior

should not be subjected to pre-trial residence in a prison system which has become a petri dish for the proliferation of this deadly virus with extremely limited access to counsel. As the Court is certainly aware, the discovery in this case is so voluminous that a discovery coordinator has been approved by Your Honor. Given the limits on visitation and contact with our client, it will be extremely difficult, if not impossible, to review the discovery with Mr. Senior in a manner which will honor his constitutional rights to present a defense, a speedy trial and, a fair trial.

While we readily acknowledge the seriousness of the charged offenses and that this is a case for which the presumption applies, we respectfully submit that, in comportment with the Constitution and the requirements of 18 U.S.C. § 3142, there are reasonable conditions of release sufficient to assure the Court of Mr. Senior's appearance and the safety of the community. Accordingly, we propose that Mr. Senior be released on a bond in the amount of $2,500,000.00 secured by the five properties and thirteen co-signors listed below and with strict pre-trial conditions of release including home confinement and electronic monitoring as well as the surrender of any travel documents.

## THE LAW ON PRE-TRIAL DETENTION

Bail is enshrined in our constitutional history and tradition. In <u>Stack v. Boyle</u>, 342 U.S. 1 (1951), the United States Supreme Court affirmed our long-standing societal interest in freedom from pretrial detention:

> From the passage of the Judiciary Act of 1789 to the present Federal Rules of Criminal Procedure, federal law has unequivocally provided that a person arrested for a non-capital offense shall be admitted to bail. This traditional right to freedom before conviction permits the unhampered preparation of a defense, and serves to prevent the infliction of punishment prior to conviction. Unless this right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning.

As punishment by imprisonment comes only after conviction by proof beyond a reasonable doubt, pretrial detention is authorized in limited circumstances and only on an adequate showing that that the defendant poses a danger to the community or is likely to flee prior to trial. <u>United States v. Salerno</u>, 481 U.S. 739 (1987); <u>United States v. Paulino</u>, 335 F. Supp. 3d 600 (2018). Under our Constitution, preventive detention "has been and should remain the exceptional practice." <u>United</u>

States v. Scarpa, 815 F. Supp. 88 (1993). As the Supreme Court stated in United States v.
Montalvo-Murillo, 495 U.S. 711 (1990):

> It is well to remember the magnitude of the injury that pretrial
> detention inflicts and the departure that it marks from ordinary forms
> of constitutional governance. Executive power to detain an
> individual is the hallmark of the totalitarian state. Under our
> Constitution the prohibition against excessive bail, the Due Process
> Clause of the Fifth Amendment, the presumption of innocence –
> indeed, the fundamental separation of powers among the
> Legislative, the Executive and the Judicial Branches of Government
> – all militate against the abhorrent practice. Our historical approach
> eschewing detention prior to trial reflect these concerns…

Liberty before a criminal trial is, and has always been the "norm" (United States v. Paulino, *supra*,
*citing*, United States v. Salerno, *supra*, at 755).

The Bail Reform Act requires the release of a defendant on the "least restrictive" conditions
necessary to "reasonably assure . . . the safety of any other person and the community."  18 U.S.C.
§ 3142 (b)(1)(c). The Government must prove, by clear and convincing evidence, that the
defendant poses a danger to the community or a risk of flight such that "no conditions or
combination of conditions" will alleviate. 18 U.S.C. § 3142(e) and (f).  The Government thus bears
a "high burden" to justify detention. United States v. Chimurenga, 760 F.2d 400 (2d Cir. 1985);
*See also* United States v. Sabhnani, 493 F.3d 63 (2d Cir. 2007).

18 U.S.C. § 3142 (g) delineates the factors to be considered by a judicial officer in making
a determination as to whether conditions exist that will reasonably assure the appearance of the
accused as required and the safety of any other person and the community. These considerations
are generally separated into two categories: the nature of the offense and the personal
characteristics of the accused. The relevant factors include the nature and circumstances of the
offense charged, including whether the offense is a crime of violence or it involves a narcotic drug,
the weight of the evidence against the accused, the history of the accused, including his character,
family ties, employment, financial resources, length of residence in the community and community
ties, history relating to drug abuse, criminal history, and past record of appearing at court ordered
appearances. With regard to whether a defendant poses a danger to the community, the court
should consider "the nature and seriousness of the danger to any person or the community that
would be posed by the person's release" (18 U.S.C. § 3142 (g)(4)).

The Bail Reform Act of 1984 included consideration of danger to the community as a

relevant factor in bail determinations and authorized pretrial detention only where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community" (United States v. Paulino, 335 F. Supp. 3d 600 (2018); *citing*, United States v. Chimurenga, 760 F.2d 400, 403 (2d Cir. 1985). This inclusion of danger to the community reflected the concerns for safety, however, with the "recognition that there is a *small but identifiable group of particularly dangerous individuals* as to whom neither the imposition of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community" (United States v. Paulino, *supra*, at 608; [emphasis in original]; *quoting*, S. Rep. No. 98-225, at 6-7, *as reprinted in* 1984 U.S.C.C.A.N., at 3188-3189); see also, United States v. Shakur, 817 F.2d 189, 195 (2d Cir. 1987) [The BRA itself requires that a court should "bear in mind that it is only a 'limited group of offenders' who should be denied bail pending trial]; United States v. Salerno, 481 U.S. at 755 ["detention prior to trial or without trial is the carefully limited exception" to liberty before trial]. As Judge Andrew Carter made clear in Paulino, *supra*, these tenets must be scrupulously adhered to in order to sustain the presumption of innocence in the pre-trial stages:

> One charged with a crime is, after all, presumed innocent. Stack, 342 U.S. at 4, 72 S.Ct. 1. A single individual unnecessarily detained before trial is one individual too many, and the increasing use of the practice places tremendous wear on our constitutional system. *United States v. Montalvo-Murillo,* 495 U.S. 711, 723-24, 110 S.Ct. 2072, 109 L.Ed.2d 720 (1990) (Stevens, J., dissenting, joined by Brennan and Marshall, JJ.). Due to the crucial interests involved, it follows that a "case-by-case" approach is required at any stage of the case in assessing the propriety of pretrial detention. *See United States v. Gonzales Claudio,* 806 F.2d 334, 340 (2d Cir. 1986) (citations omitted) (discussing due process analysis for evaluating propriety of prolonged pretrial detention, and the interests at stake), *cert. dismissed sub nom., Melendez-Carrion v. United States,* 479 U.S. 978, 107 S.Ct. 562, 93 L.Ed.2d 568 (1986).

Paulino, *supra*, at 609.

While safety is a concern for any court assessing cases involving violence, these concerns can be, and have been, addressed with pre-trial release conditions. In Chimurenga, *supra*, the Second Circuit affirmed the lower court's holding that the defendant did not pose a danger to the community notwithstanding the crimes of violence with which he was charged. The defendant was alleged to be the leader of a gang responsible for an armed robbery in Nanuet, New York which

resulted in the death of an armored truck guard and two police officers. There was a wealth of evidence, including taped conversations concerning the murders and means of flight in the face of potential imprisonment. In <u>Paulino</u>, *supra*, Judge Carter wrote extensively on why he concluded that the defendant, an alleged gang member, should be released on a bond. The charges involved the beating and stabbing of a minor who was alleged to be a member of a rival gang. In <u>Sabhnani</u>, *supra*, the district court permitted the defendant released on bail, *after he was convicted* of crimes of violence, in order to put his affairs in order in preparation for sentence (*See also*, <u>United States v. Jamel McTier</u>, 17-cr-557 (FB)).

When considered in light of the statutory and judicial landscape detailed above, we respectfully submit that Caswell Senior is neither a risk of flight nor a danger to the community such that reasonable conditions of release cannot be set.

### *Risk of flight*

Caswell Senior is not a risk of flight and any arguments to the contrary posited by the Government should be rejected. When confronted with the prospect of a significant prison term while at liberty and prior to an arrest, some people run and hide. Caswell Senior did not do so. He learned of this Indictment shortly after others had been arrested and presented to the Court. He immediately contacted counsel to arrange for his surrender. Mr. Senior was made aware of the charges, the statutory penalties and his exposure on the charges before this Honorable Court.

The undersigned consulted with the Government and made it abundantly clear that Mr. Senior had no intention of absconding and would turn himself in. Indeed, on December 1, 2020, the undersigned spoke with an agent who was at Mr. Senior's home and had contacted Mr. Senior's wife. The agent conferenced in the Assistant United States Attorney and it was made clear that Mr. Senior fully intended to surrender.

The following day our discussions continued. Mr. Senior had requested that he be permitted to surrender on Friday, December 4, 2020 so that he could make arrangements for his absence. The Government insisted that he surrender immediately. Mr. Senior complied with this demand. The undersigned accompanied Mr. Senior on December 2, 2020 to the midtown south precinct and he voluntarily surrendered at approximately 11:30 PM. He was permitted to walk into the precinct where he was handcuffed and later transported to the Westchester County Jail where he remained in quarantine for the requisite fourteen days.

We respectfully submit that there is no credible argument that Mr. Senior can be considered

a flight risk to any degree. The notion that he would surrender to the authorities with full knowledge of the charges against him but then not return to court as directed once released is inconsistent with his voluntary surrender and common sense. His surrender demonstrates his respect for this Court and the judicial process and there can be no credible argument that he presents a risk of flight.

### Danger to the Community

While Mr. Senior is charged with narcotics trafficking and weapons possession in relation to narcotics trafficking, there are no specific allegations in the Indictment to support his actual commission of these crimes in furtherance of the enterprise charged. He is, essentially alleged to be a member of the enterprise as a result of his rap lyrics – his profession as a rapper (*See*, Government Detention Memo, **Exhibit B**). In the Government's detention memo, the Government introduces Mr. Senior as "a rapper of some notoriety" and claims that Mr. Senior has "amplified" the message of the gang through his music and social media profiles. To further this claim, the Government attached two photographs of Mr. Senior with gorilla jewelry and posing next to a painting of a gorilla. While the Government may claim that this is somehow relevant to its assertion of an affiliation with the other alleged members of this group, these postings are not evidence of any criminality. To be clear, Mr. Senior vehemently denies trafficking in drugs or possessing a weapon in relation to any criminal activity.

The Government's claim that co-defendant Luster was overheard admitting that Mr. Senior has called upon him to provide protection, and its extrapolation that a reference to "hammers" refers to firearms, is likewise not evidence of membership in the alleged enterprise or the charges herein. Here the Government has taken the purported words of another and posited a nefarious intention to Mr. Senior. Mr. Senior has never asked anyone to accompany him with weapons for any purpose, let alone his public, video-taped performances.

Finally, the Government cites Mr. Senior's pending robbery charge in New York Supreme Court as a "concrete example of how he has relied on the gang for acts of violence". This is simply untrue. Mr. Senior was at a restaurant eating. The victim was using her phone to video tape him. He asked her to stop and she refused. The video tape clearly shows that Mr. Senior did not rob this young lady or in any way importune his then co-defendant to harm her. While his co-defendant pled guilty to this offense, Mr. Senior did not. In fact, Mr. Senior's attorney on the New York County case advised the undersigned that Mr. Senior was offered a misdemeanor to resolve the

case. Mr. Senior refused the offer – hardly the position of a man who had robbed or assaulted someone with the crime captured on video. Again though, the Government asserts that because Mr. Senior was in the presence of an alleged gang member who did commit a violent act, he too must be a part of an allegedly violent gang.

While the Indictment sets forth several substantive counts alleging specific conduct against several co-defendants, there are no such counts with respect to Mr. Senior. As set forth below and as cited by the Government in its detention memorandum, Mr. Senior has a prior robbery conviction for which he served six years. He was released in 2013. Despite the Government's investigation of this alleged enterprise for several years, there are no acts of violence alleged against Mr. Senior for the five years he served on supervised release until 2018 or at any time during the period alleged in the Indictment. We submit that the evidence will ultimately demonstrate that Mr. Senior is not a member of any criminal enterprise and that he is not a drug dealer or a danger to the community such that strict pre-trial conditions – essentially confining him to his home with electronic monitoring – cannot achieve the objectives of pre-trial release while honoring Mr. Senior's constitutional rights.

***Personal History***

Caswell Senior is 34 years of age and was born in Brooklyn, New York where he lived with his mother and five siblings. He is a lifelong resident of New York. His father was not present during his childhood. Mr. Senior attended Arasmus High School until the 11th grade. As reflected in the Government's detention memo, Mr. Senior has two prior convictions. His last conviction was for Robbery for which he served a six-year prison sentence and was released in 2013. As such, Mr. Senior was in prison for the first three years in which the enterprise is alleged to have acted (*See*, Indictment, **Exhibit A**, Page 6). He was discharged from parole in 2018 without any violations.

After his release in 2013, Mr. Senior worked in construction with the Local 79 union. He also began his artistic career as a rap artist. While in a studio, Mr. Senior created his first hit, "Don't Run" which was later commercially produced and launched Mr. Senior's career as a rap artist. In June, 2016, Mr. Senior released the official video of "Don't Run" and was signed by Jay-Z's record label Roc Nation. He has since released several recordings and performed at venues with other major recording artists. He was therefore incarcerated from 2010 through mid-2013 and has spent the ensuing years pursuing his musical career, not participating in the criminal enterprise

alleged.

Mr. Senior has been in a 17-year relationship with Jasmere Corbitt and has two children, who he has supported since birth to the best of his ability.

We respectfully submit that the facts detailed above fully support Mr. Senior's release on the significant bond proposed herein with strict pre-trial conditions of home confinement, electronic monitoring and any other restrictions deemed appropriate by this Court. In addition to the foregoing, the COVID-19 pandemic and its effect on Mr. Senior's ability to review discovery, meet with counsel for the extended periods of time necessary for said preparation and thus his ability to present a defense further supports his release, or at a minimum, his temporary release until the effects of the pandemic are ameliorated.

### *The health threat posed by the COVID-19 pandemic and its effect on Mr. Senior's ability to prepare for trial warrants his temporary release.*

Mr. Senior is currently detained at the WCJ, in Valhalla, New York. At present, it does not appear that COVID-19 statistics are publicly displayed on the Westchester County Jail's website. However, this facility is not immune to the spread of COVID-19. "[Dozens of inmates and correction officers at the [Westchester County Jail] have tested positive for the coronavirus."[1] Notwithstanding the current level of infections at the facility, social visits remain suspended and legal visits are by appointment only and for a limited time. While there are no available updates on this facility, the public reporting on Westchester County is a reliable indicator of the rate of infection in the area in which the facility is located. Westchester County reported 827 new COVID-19 cases on December 29, 2020.[2]

On December 17, 2020 a comprehensive analysis of the spread of the pandemic within prisons across the country was set forth by The Marshall Project. By December 15, at least 276,235 people in prison had tested positive for the illness, a 10 percent increase from the week before.

---

[1] Mark Lungariello and Christopher J. Eberheart, "65 People Released from Westchester County Jail over COVID-19 fears," *The Journal News* (Apr. 10, 2020), at https://bit.ly/2YjtRct (noting that "[t]he virus has been spreading rapidly in the Valhalla jail."). Absent published figures on infections within the Westchester facility the court should assume the worst – MDC, for example, is now recovering from an extraordinary number of recent infections and still has 15 currently positive-testing inmates and 14 staff (147 inmates and 45 staff have recovered). MCC has 14 currently positive-testing inmates and 8 staff – and these numbers are only as good as the level of testing, which has been poor. System-wide, the BOP is undeniably in crisis and while the Westchester County Facility is a state facility, there is a distinct probability that the crisis will continue to affect both inmates and staff at various intervals (*See also*, United States v. Cuevas, 2020 WL 443680, at 5* (D. Md. Aug. 3, 2020)(Hazel,J.)).

[2] *See* Westchester County COVID-19 Dashboard, https://wcgis.maps.arcgis.com/apps/opsdashboard/index.html#/280339d96db14efd9cc304dba0f3a71d

New infections reached their highest level since the start of the pandemic. The latest surges have far outpaced the previous peak in early August. California reported nearly 6,000 new cases. The Federal Bureau of Prisons had more than 3,000 infected individuals.[3] As detailed in the graph below, the week of December 15, 2020 saw 3,924 new inmate cases of COVID-19 within federal facilities[4], an indication that the spread of the virus within federal facilities is far from contained. While vaccines have been approved and are being administered throughout the country, this will not have an impact on the recent surge of infections for several months at best. There is no dispute that the threat of infection in the prison system and the restrictions on visitation and client contact will remain in effect for the ensuing months at a minimum.



While the threat of infection is clearly an issue of concern for Mr. Senior and all other inmates, the effect of the pandemic on our access to our clients in order to prepare for trial is another factor which must be considered. Over the past several months, attorney visits have been

---

[3] *See* The Marshall Project, *A State-by-State Look at Coronavirus in Prisons*,
https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons
[4] *Id*.

suspended, only to be reinstated and then suspended again. Our visits are now by appointment only and are limited in time. Video consultations are also by appointment and also limited to one hour. The video technology at the Westchester County facility, however, is less than ideal. It is very difficult to communicate as the sound often cuts off. It is clearly ineffective for purposes of discovery review and effective communication concerning the discovery and trial strategy.

The deleterious effect on our investigation and preparation of a defense is particularly amplified in this case. The Government has indicated that there are terabytes of discovery to be produced. Indeed, the volume of discovery has precipitated the appointment of a discovery coordinator, the use of which is limited to cases involving an untenable volume of discovery. The discovery consists of several wiretaps, thousands of conversations, prison-calls, text messages, social media videos and posts and other voluminous warrant applications and documentary evidence. It is simply impossible to review these materials with our client under the extant restrictive conditions. This clearly implicates Mr. Senior's constitutional rights to the effective assistance of counsel, his right to present a defense and to a speedy trial.

The Sixth Amendment right to counsel is the cornerstone of our adversarial system of criminal justice. As the Second Circuit recently emphasized: "The right to consult with legal counsel about being released on bond, entering a plea, negotiating and accepting a plea agreement, going to trial, testifying at trial, locating trial witnesses, and other decisions confronting the detained suspect, whose innocence is presumed, is a right inextricably linked to the legitimacy of our criminal justice system." Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons, No. 19-1778, 2020 WL 1320886, at *11 (2d Cir. March 20, 2020).

In recognition of this vital right, BOP regulations instruct that detention center wardens "shall provide the opportunity for pretrial inmate-attorney visits on a seven-days-a-week basis." 28 C.F.R. § 551.l 17(a). A detention facility therefore violates the Sixth Amendment when it "unreasonabl[y] interfere[s] with the accused person's ability to consult counsel." Benjamin v. Fraser, 264 F.3d 175, 185 (2d Cir. 2001). Unreasonable interference requires a showing far less alarming than the one present here. In Benjamin, the Second Circuit held that New York City correctional facilities violated the right to counsel when defense attorneys "routinely face[d] unpredictable, substantial delays in meeting with clients" and were "forced to wait between 45 minutes and two hours, or even substantially longer, after arriving at a facility to see a client." Benjamin, 264 F.3d at 179.

When an individual is in custody, the Bail Reform Act "permit[s] the temporary release of the person, in the custody of a United States Marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). There is no greater necessity for the preparation of a "person's defense" than access to counsel and the review of discovery and there is no more "compelling reason" than the individual's physical health.

Temporary release can also be granted pursuant to 18 U.S.C. § 3142(c)(b)(i) which provides for release into the "custody of a designated person, who agrees to assume supervision and to report any violation of a release condition to the court, if the designated person is able reasonably to assure the judicial officer that the person will appear as required and will not pose a danger to the safety of any other person or the community". We are prepared to advise the Court of responsible individuals who stand ready to assume this role.

Indeed, Judge Nathan recently recognized that "the obstacles the current public health crisis poses to the preparation of the Defendant's defense constitute a compelling reason [to release the Defendant] under 18 U.S.C. § 3142(i)." United States v. Stephens, 15-CR-95 (AJN) (Mar. 19, 2020); see also United States v. Perez, 19-CR-297 (PAE) (Mar. 19, 2020) (concluding "compelling reasons exist for temporary release of the defendant from custody during the current public health crisis"); See also, United States v. Hudson, 19-CR-496 (CM) (Mar. 13, 2020).

In United States v. Rodriguez, the court held that with respect to an accused's need to consult with counsel, "Section 3142(i)(3) reaches above the minimum" standards set by the Sixth Amendment. 2014 WL 4094561, at *4 (W.D.N.Y. 2014) (Scott, M.J.). The subsection's plain text "mandates the removal of any impediment to 'private consultations' [between attorney and client] that are qualitatively and quantitatively 'reasonable.'" Id.; cf. Falcon v. U.S. Bureau of Prisons, 52 F.3d 137, 139 (7th Cir. 1995)[emphasis added]("Section 3142(i)(3) is designed to protect a defendant's Sixth Amendment right to counsel, and if that right is being infringed, [the court] has the statutory authority to protect [defendant's] access to counsel.").

We recognize that the COVID-19 pandemic has necessitated restrictions on visitation. The Westchester facility does its best to schedule the visits and the video conferences. These visits and video conferences are simply inadequate. The simple fact is that the continued limitation on our ability to meet with Mr. Senior for extended periods of time will deprive him of his constitutional rights to prepare a defense, to have as speedy a trial as possible and to the effective assistance of

counsel in the preparation for the extensive litigation which will ensue in this case. Until the current wave of infections subsides and "qualitatively and quantitatively reasonable" contact with our client is restored, the only way to ensure Mr. Senior's statutory and constitutional rights is to release him, at a minimum, for the duration of the coronavirus outbreak.

We also recognize that a trial in this case would be in the distant future even without the effects of the pandemic. It is that voluminous a case. We expect the Government to cite this temporal gap in opposition to this request. It is, however, during these months, during the pandemic, that defendants must have unfettered access to the discovery and to counsel to review it and prepare a defense. Indeed, our inability to do so gives the Government an unfair advantage in this litigation which the Government seeks to imprison a young man for the rest of his life. The Government can spend this time preparing for trial. They have all the discovery. They have already reviewed it. They have the 3500 material which the defense will get on the eve of trial. They have access to the agents and the ability to continue their investigation is unfettered (except for masks and social distancing). We, on the other hand, cannot effectively review the discovery with our client until the pandemic subsides.

Once the pandemic subsides, hopefully by the fall, and the limitations to our access with our clients are ameliorated, we will then need several months to review the discovery with our client and prepare for trial. Even assuming the Court's willingness to grant us this time, our client will nevertheless remain incarcerated for months longer than he otherwise would were he to be at liberty and able to prepare for trial with counsel.

Based upon the foregoing, we respectfully submit that Mr. Senior should be released on a bond as outlined below.

---

We submit the following bail package for the Court's consideration. We propose a bond in the amount of $2,500,000.00 secured by five properties and co-signed by the thirteen co-signors listed below. The equity in the properties alone is approximately $1,103,669.00. The co-signors have combined salaries of approximately $1,266,145.00 The conditions of this release will be as strict as this Court deems necessary – including home detention and any other geographic restrictions on travel supported by electronic monitoring, as well as the surrender of any and all travel documents. We ask only that Mr. Senior be permitted to attend to his medical needs and

meetings with counsel, with notification to Pretrial Services and with the Government and the Court's approval. To follow is a list of the properties to be posted to secure the requested bond along with the proposed suretors.[5]

**Properties to be posted**

Property 1:      ███████████████████████████
               Value: Approximately ████████████
               Debt: Approximately ██████████
               Equity: Approximately ██████████
               Owner: █████████████
               Relationship to Mr. Senior: ████████

Property 2:      ███████████████████████████
               Value: Approximately ██████████
               Debt: Approximately █████████
               Equity: Approximately █████████
               Owners: ████████████████████
               Relationship to Mr. Senior: ██████████

Property 3:      ████████████████████████
               Value: Approximately ██████████
               Debt: Approximately ████
               Equity: Approximately ████████
               Owners: ████████████████████
               Relationship to Mr. Senior: ████████

Property 4:      ████████████████████████
               Value: Approximately ██████████

---

[5] We have redacted the personal information of the suretors to ensure their privacy and to avoid harassment. All documentation for the properties and suretors is available for inspection by the Government.

Debt: Approximately █████████

Equity: Approximately █████████

Owner: ████████████

Relationship to Mr. Senior: ████

Property 5:       ████████████████████████████████████████████

Value: Approximately ███████████

Debt: Approximately █████████

Equity: Approximately █████████

Owner: ████████████████

Relationship to Mr. Senior: ███████████████

**<u>Co-signors</u>**

<u>Suretor</u>: ████████████████

- Social Security Number: ██████████
- Employment: █████████████████████████████████████████
- Salary: ████████████
- Relationship to Mr. Senior: ████████████

<u>Suretor</u>: ██████████████

- Social Security Number: ██████████
- Employment: ███████████████████████████████████████████████
- Salary: Approx. ██████████
- Relationship to Mr. Senior: ████████████████████████████

<u>Suretor</u>: █████████

- Social Security Number: ██████████
- Employment: ███████████████████████████████
- Salary: ████████████
- Relationship to Mr. Senior: █████████████████████████

Suretor: ████████████

- Social Security Number: █████████
- Employment: ██████████████
- Salary: ████████
- Relationship to Mr. Senior: █████████

Suretor: █████████

- Employer Identification Number: ██████████
- Employment: ████████████████████████████████████████████
- Salary: ████████
- Relationship to Mr. Senior: █████████

Suretor: ███████████

- Social Security Number: █████████
- Employment: ████████████████████████████████████████████
  ██████████████████
- Salary: ████████
- Relationship to Mr. Senior: ███████████████

Suretor: ██████████

- Social Security Number: █████████
- Employment: ██████████████████████████████████████████
- Salary for 2020 to date thus far: ██████████
- Relationship to Mr. Senior: █████████

Suretor: ██████████

- Social Security Number:
- Employment: ██████████████
- Salary: ████████
- Relationship to Mr. Senior: ██████████████

Suretor: █████████

- Social Security Number: ██████
- Employment: █████████████
- Salary: ██████
- Relationship to Mr. Senior: ████████

Suretor: ████████

- Social Security Number: ██████
- Employment: ███████████
- Salary: Approx. ██████
- Relationship to Mr. Senior: ████████

Suretor: █████████

- Social Security Number: ██████
- Employment: █████████████████████
- Salary: Approximately ███████
- Relationship to Mr. Senior: █████████████████████

Suretor: ████████

- Social Security Number: ██████
- Employment: ████████████████████
- Salary: ██████
- Relationship to Mr. Senior: ██████████

Suretor: ████████

- Social Security Number: ██████
- Employment: ██████████████████████
- Salary: ██████
- Relationship to Mr. Senior: █████

The co-signors in this case are Mr. Senior's closest family and friends – they include his ██████████████████. The total equity in the properties being posted is approximately $1,103,669.00 and the salaries of the co-signors combined is approximately $1,266,145.00. All of these individuals are placing their future and financial stability on the line with this bond, yet they do so with an abiding faith that their friend and family member would never leave them destitute. With their dependents, there are well over 20 men, women and children who will be affected by the consequent indebtedness to the Government and the ensuing financial ruin that would follow if Mr. Senior were to flee or violate any conditions of his bond. They know him best, and each of them has expressed their unequivocal certainty that Mr. Senior would never put their financial lives and well-being at risk. They are confident that both his character and his love and commitment for his family and friends combine to make the possibility of his flight from this Court's jurisdiction non- existent. He will not flee or violate any conditions of release imposed by this Honorable Court.

## CONCLUSION

Based upon the foregoing, it is respectfully submitted that there exist reasonable conditions of release sufficient to assure Mr. Senior's compliance with a bond. As such, it is respectfully requested that the Court grant Mr. Senior's pre-trial release in this matter.

Dated:          January 2, 2021
                New York, New York


                                        Respectfully Submitted,


                                        _____/s/_____

                                        JAMES KOUSOUROS
                                        Law Offices of James Kousouros
                                        260 Madison Avenue, 22nd Floor
                                        New York, NY 10016
                                        Tel: (212) 532-1934
                                        Fax: (212) 532-1939
                                        James@kousouroslaw.com

cc:    Hon. Philip M. Halpern

       David Felton
       Shiva Logarajah
       Jacob Warren
       *Assistant United States Attorneys*

       Caswell Senior