

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*United States District Courthouse*
*300 Quarropas Street*
*White Plains, New York 10601*

January 6, 2021

**BY ECF**

The Honorable Philip M. Halpern
United States District Court Judge
Southern District of New York
300 Quarropas Street
White Plains, New York 10601

      Re:    *United States v. Caswell Senior, a/k/a "Casanova," * **20-cr-626 (PMH)**

Dear Judge Halpern:

      The Government respectfully submits this letter in opposition to defendant Caswell Senior's motion for pretrial release. For the reasons set forth below, the Government agrees with the recommendation of Pretrial Services that detention pending trial is warranted in this case.

**I.    Applicable Law**

      The Government's initial detention memorandum, attached and incorporated as Exhibit A, sets forth the governing standards. As set forth in that memorandum, this is a case where there is a statutory presumption of detention because the defendant is charged with both a controlled substance offense punishable by at least 10 years imprisonment and offense under Section 924(c). 18 U.S.C. § 3142(e)(3)(A), (B). Thus, the defendant "bears a limited burden of production—not a burden of persuasion—to rebut that presumption by coming forward with evidence that he does not pose a danger to the community or a risk of flight." *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001).

**II.    The Defendant Cannot Rebut the Presumption of Dangerousness**

      The defendant offers little to assure the safety of the community apart from blanket and wholly unrealistic denials of the very serious charges returned by the Grand Jury. This is, of course, wholly insufficient and fails to satisfy even the "limited burden" placed on him to rebut the presumption that he poses a danger to the community. And so the presumption of detention based on dangerousness remains amply supported in this case.

      *The Charges Here Are Supported By Robust Evidence*

      The crux of the defendant's arguments on this front is that there is little to no evidence that he committed the charged crimes. *Cf. United States v. Contreras*, 776 F.2d 51, 53–54 (2d Cir.

January 6, 2021
Page 2 of 13

1985) (holding an Indictment returned by a Grand Jury "conclusively determines the existence of probable cause"). The defendant states that the Government's case boils down to his "rap lyrics." Def's Submission at 10. That is simply not true. While it is incredibly disturbing that the defendant used his now-deleted Instagram profile and public platform to shamelessly promote a violent street gang, his participation in the Untouchable Gorilla Stone Nation ("Gorilla Stone") enterprise ran much deeper than that. Right up until his arrest, the defendant was in the thick of Gorilla's Stone's dangerous and illicit activity.

With respect to dangerousness, and as detailed below, the defendant has access to numerous firearms, and appears to be regularly armed. For example, in the hours before his co-defendants were arrested on December 1, 2020, the defendant posted the picture of the below assault rifle with the caption "Gripped Up."



Plainly, the defendant is not coy about his use of firearms. In public interviews describing the several gunpoint robberies that he has committed (described further below), the defendant has admitted that he, often times, was the individual carrying a gun and threatening innocent store owners. In addition to the disturbing, emphatic, and public-facing evidence of firearms above, as noted in Exhibit A, the defendant also had several images of firearms stored in his private iCloud, including the arsenal depicted below:



And there is strong evidence—not only from the pictures from his iCloud and Instagram—that he has continued to carry firearms. As part of this investigation, law enforcement installed a listening device at the Auburn Correctional Facility to record visits with Gorilla Stone's leader and founder, co-defendant Dwight Reid, a/k/a "Dick Wolf." In one visit between co-defendant Walter Luster, a/k/a "Shells," and Reid, Luster relayed to Reid how Senior had accidentally fired a gun at a recent poker game in New York City. Luster, who himself had a close relationship with Senior and was frequently physically with him, then further elaborated that Senior *always* had a gun on him.

Similarly, the defendant has not been shy about his narcotics trafficking. *See United States v. Leon*, 766 F.2d 77, 81 (2d Cir. 1985) (noting that "it is clear that the harm to society caused by narcotics trafficking is encompassed within Congress' definition of 'danger'" in the Bail Reform Act). Senior used his now-deleted Instagram page proudly to promote his own brand of marijuana, including in the pictures below depicting resale quantities of narcotics:



And, troublingly, Senior used Gorilla Stone members to sell narcotics. Senior openly told other gang members, based on text messages recovered from his iCloud, that his "2x" marijuana was going for "1,700 a qt." As described in Exhibit A, co-defendants Naya Austin and Brandon Soto—two of the gang's most violent members—trafficked in Senior's branded marijuana. Cellphone extractions also indicate that Austin picked up a supply from Senior personally and then paid Senior back via CashApp.

Senior's narcotics trafficking was not limited to his speciality marijuana. Text messages recovered from Senior's iCloud also demonstrate that Senior used narcotics trafficking as a way to assist gang members. For example, in May 2020, an individual ("Individual-1") texted Senior a picture of a large amount of marijuana.

January 6, 2021
Page 5 of 13



The defendant then made an arrangement to pick up some marijuana with another recently released leader of Gorilla Stone ("Leader-1").  Individual-1 specifically told the defendant before they made arrangments to meet: "I'm gonna [get Leader-1] some things for him to get on his feet"—in other words, a supply of narcotics to help Leader-1 make money since he was just released from prison—"and something for you."[1]  Indeed, the defendant made plain his desire to help Leader-1, texting Leader-1 shortly after his release from prison: "Gonna grab you up and move you around wit me." Leader-1 responded: " Love you Ape."

This is not the only example of the defendant seeking to protect fellow leaders of Gorilla Stone.  The defendant went out of his way to maintain his relationship with Reid—the leader and shotcaller in Gorilla Stone.  Indeed, just a little over a week before his arrest, the defendant visited Reid at the Auburn Correctional Facility.[2]

---

[1] Law enforcement seized a cellphone from Individual-1 and obtained a warrant to search it.  Based on a review of text messages from Individual-1's cellphone, Individual-1 and Leader-1 continued to exchange messages about narcotics trafficking after the defendant made the initial introduction.

[2] The defendant gave an address not associated with him when visiting Reid in prison.



As set forth in Exhibit A, the defendant was intercepted on numerous prison calls with Reid. The defendant went out of his way to support Reid and the gang—and not just by kicking back money for commercial ventures directed by Reid. For example, the defendant reached out to Reid's wife on his own to arrange for payments to Reid, as this recovered text message from his iCloud demonstrates:



The defendant did not simply seek to stay in Reid's good graces: he saw himself as a steward and leader of the violent organization Reid started. In recovered text messages from his iCloud, he bragged to others about his membership in Gorilla Stone under Reid:

January 6, 2021
Page 7 of 13



He also actively promoted gang meetings:



Here, the defendant is telling the gang's members that if they choose not to show up to this "Mandatory" gang meeting it "will be taken as A Direct act of Disrespect & You will Be Wiped Down Immediately." "Wiped Down," is a term used by Gorilla Stone members to refer to formally kicking someone out of the gang, a process that often includes violence against the member being kicked out.  Senior further directs payments for the upcoming meeting to be given to "Shells," *i.e.*, his close friend, Luster.  Senior saw his public profile as a way to expand the Gorilla Stone enterprise.  In a text message to Reid's wife—when discussing one of the pieces of gorilla jewelry depicted in Exhibit A which Senior dismisses in his submission as "not indicative of any criminality," Def's Submission at 10—he wrote:



Plainly stated, the defendant left little doubt that the wealth and notoriety he accrued would be used to promote a street gang that was committed to violence.[3]

The above proffered evidence is certainly not all of the Government's evidence against Senior, and a bail hearing is not a "mini-trial" or a "discovery tool for the defendant." *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986). But even this should dispel the notion that the "evidence will ultimately demonstrate that [the defendant] is not a member of any criminal enterprise and that he is not a drug dealer or a danger to the community." Def's Submission at 11.

*The Defendant Committed This Conduct While On Pretrial Release*

One of the most concerning aspects of Senior's bail application is the fact that he is already on pre-trial release for another violent felony. This alone shows that the defendant will not abide by any terms of release set by the Court. Indeed, all of the very disturbing conduct detailed above occurred while the defendant was on pretrial release for a violent felony. The defendant has been on pretrial release for a pending second-degree robbery charge in New York County Supreme Court since August 2018. The defendant goes to great lengths to minimize this outstanding robbery charge. That does not, however, change the fact that he was afforded pretrial release—despite several felony convictions as discussed below—and continued to blithely and unabashedly engage in criminal conduct. In sum, his behavior on pretrial release for the past two years has eliminated any guesswork for this Court as to what he may do if granted pretrial release here. *Cf. United States v. Paulino*, 335 F. Supp. 3d 600, 614 (S.D.N.Y. 2018) (noting that "past behavior best predicts future behavior and whether the court can rely on [the] defendant's good faith promises" (internal quotation marks omitted)). Moreover, the evidence against Senior in that case is strong, based on the surveillance video from the robbery where Senior and his co-defendant are readily identifiable. His co-defendant in that case pled guilty and was sentenced to five years' imprisonment—far from a slap on the wrist.

---

[3] The defendant also admitted to being a member of Gorilla Stone during public interviews. For instance on November 26, 2019, during Nick Cannon's Morning Show on Power 106 FM in Los Angeles, the defendant admitted: "I'm still Ape though."

*The Defendant Has An Extensive Criminal History Punctuated By Violence*

At the age of 34, the defendant has six criminal convictions: three felony and three misdemeanor convictions.[4] All three of his felony convictions were for robbery in the first degree, incurred for three separate gunpoint robberies the defendant participated in.

The weight, significance, and violent nature of these criminal convictions cement why the presumption of detention here is more than supported. *Cf. United States v. Chimurenga*, 760 F.2d 400, 406 (2d Cir. 1985) (finding "previous felony convictions" would weigh in favor of detention).

*The Cases The Defendant Cites Do Not Support His Release*

The defendant urges the Court to rely on *Chimurenga* and *Paulino*. Both of these cases do not support his release for a number of reasons. *First*, the defendants in both *Chimurenga* and *Paulino*, unlike the defendant here, were both charged with offenses that did not carry the presumption of detention. *See Chimurenga*, 760 F.2d at 405 (holding that "rebuttable presumption did not apply"); *Paulino*, 335 F. Supp. 3d at 610 (noting that the "defendant [was] not charged with an offense giving rise to the statutory presumption"). *Second*, the defendants in those cases, unlike the defendant here, had little to no criminal history. *See Chimurenga*, 760 F.2d at 402 (noting "[d]efendant has no criminal record"); *Paulino*, 335 F.3d at 613-614 (noting defendant only had two prior convictions, one a violation and the other a misdemeanor, and distinguishing from a case where the defendant had a "*pattern* of criminal activity"). *Third*, the defendant in *Chimurenga*, unlike the defendant here, was not under any court supervision when committing the alleged crimes. 760 F.2d at 406 (distinguishing case from a case where the defendant was on "parole from a previous conviction"). *Fourth*, and finally, the defendant in *Paulino*, unlike the defendant here, was not alleged to have been a "leader or primary actor" in a violent gang—somebody whose role is to "strategize, motivate, and communicate" for the gang. 335 F. Supp. 3d at 616.

In sum: the defendant here presents a constellation of factors, the absence of which the courts in *Chimurenga* and *Paulino* found compelling when deciding to grant pretrial release.

*The Defendant's Bail Package Does Nothing To Assure the Safety of the Community*

Conditions such as home detention and electronic monitoring do nothing to assure the safety of the community from a defendant, such as this one, who took it upon himself to lead, grow, and manage a violent street gang. *United States v. Jimenez*, 104 F.3d 354 (2d Cir. 1996) ("We have repeatedly held that bail on conditions similar to those imposed on [defendant], including home detention, does not ensure the safety of the community."). And given his record on pretrial release right before this current case, there is zero reason to believe he will not continue to do so if released here.

---

[4] The defendant was adjudicated a youthful offender after his first felony conviction.

### III. The Defendant Is Wholly Untethered From His Own Bail Package—Which Omits Critical Details—And Such Package Does Not Rebut the Presumption That He Is A Risk Of Flight

Pretrial Services found the defendant to be a risk of flight. The Government agrees. In response, the defendant places great weight on two things: (1) his alleged self-surrender; and (2) a large bail package. For the reasons set forth below, these do not rebut the presumption that the defendant poses a risk of flight.

*The Risk of Flight*

The defendant here faces a mandatory minimum sentence of fifteen years in prison and a statutory maximum of life in a case, as described above, that centers primarily on his own statements and actions. That creates a powerful incentive to flee—especially given the incredibly comfortable lifestyle the defendant has become accustomed to in recent years. *See United States v. Williams*, 654 F. App'x 3, 4 (2d Cir. 2016) (summary order) (affirming district court order of detention where the district court found, among other things, "the strength of the evidence against [the defendant] coupled with the significant sentence [the defendant] potentially faced" created a risk of flight).

Moreover, as noted in the Pretrial Services Report, the defendant has a history of "[t]ravel outside the U.S." and "[e]xtended familial ties to a Foreign Country." PTS Report at 5; *cf. United States v. Zarrab*, No. 15 CR 867, 2016 WL 3681423, at *8 (S.D.N.Y. June 16, 2016) (finding pattern of "extensive international travel" and "ties to foreign countries" to "weigh in favor of . . . detention"); *United States v. Boustani*, 356 F. Supp. 3d 246, 255 (E.D.N.Y. 2019), *aff'd*, 2019 WL 2070656 (2d Cir. Mar. 7, 2019).

The defendant places great weight on his alleged self-surrender. It is commendable that counsel to the defendant encouraged his client to surrender. That surrender, however, happened two days after his arrest warrant was unsealed—and after the defendant knew law enforcement was searching for him.[5] Indeed, in the minutes and hours after the defendant realized law enforcement was looking for him, law enforcement stopped received geolocation data for the defendant's cell phone, which is consistent with the cellphone being dropped. And he did not self-surrender right away in Atlanta, where he was the day his arrest warrant was unsealed. It was only after several rounds of negotiations with counsel—and after the defendant seemingly dropped his cellphone and drove to New York from Atlanta—that the defendant surrendered two days later.

Thus, this was not the classic self-surrender the defendant now portrays in his submission. When he learned law enforcement was searching for him, it appears that he dropped his phone. And while, in the end, the wisdom of counsel prevailed on him, the most telling insight into this defendant comes from his first reaction the day his arrest warrant was unsealed: he ran.

---

[5] An FBI agent called Senior's cellphone the morning his arrest warrant was unsealed

*The Defendant's Bail Package is Wholly Inadequate*

The defendant puts forward a package secured by the money and property of others. Curiously and glaringly missing is any monetary commitment by the defendant—who has carefully sidestepped *any* financial disclosure to the Court—or his wife, Jasmere Corbett, to the bail package. In fact, when asked under oath to disclose his finances to Pretrial Services, the defendant declined. The entirety of the "Finances" section of the Pretrial Services Report notes "At the advice of counsel, the defendant's finances were not disclosed due to not wanting to provide estimates or approximations to Pretrial Services. *Defendant's counsel noted he would like to provide an accurate depiction of the defendant's finances to the court for a bail application and is in the process of gathering the defendant's financial information.*" PTS Report at 2 (emphasis in original). That interview took place on December 3. Despite referencing a future financial disclosure in the interview, nearly a month later, in a lengthy, 22-page bail application, the defendant continues to say virtually nothing about and instead hide his financial resources. *Cf.* 18 U.S.C. § 3142(g)(3)(A) (defendant's "financial resources" should be considered when considering bail).[6] In other words, the proposed bail package leaves the defendant with no skin in the game and the Court with no indication about the defendant's financial resources.

In addition to these glaring deficiencies with the proposed bail package, the defendant omits critical details, including where and with whom he is proposing to live. So while the defendant presents a high monetary figure before the Court, peering behind the number shows that the proposed bail package is missing even the most basic details (and commitments from the defendant) to assure the Court that the defendant would not actually flee. To be clear, given the significant dangers to the community and risk of flight, the Government does not believe that *any* bail package here would suffice; however, the defendant's proposed package does not amount to a serious consideration for release given its gaping holes.

**IV.     COVID-19 Is No Reason to Bail The Defendant**

The defendant is currently housed at the Westchester County Jail ("WCJ"). As of this writing, the WCJ has no inmates who are COVID-19 positive and only three staff members are currently COVID-19 positive. While the defendant tries to paint with a broad brush, the WCJ has taken aggressive steps to combat the pandemic, including quarantining and testing all new inmates. While this could certainly change—especially in light of the "challenges [COVID-19] poses to prison facilities," *United States v. Landji*, 2020 WL 1674070, at *6 (S.D.N.Y. Apr. 5, 2020)—the current conditions reflect the fact that the WCJ is taking appropriate measures to prevent an outbreak.

---

[6] It would seem that the defendant would have access to significant, undeclared amounts of income if released. He is signed to a major record label and has earned a considerable amount of money through sponsorships, endorsements, and other ventures. The defendant himself, in a now deleted public-facing Instagram post from in or around October 2020, shared a screenshot of a list purporting to rank the top celebrity monthly earners on the website "OnlyFans." In the screenshot, which the defendant himself publicly posted and later deleted, the defendant's monthly earnings from OnlyFans are listed as 805,950 euros, nearly $1 million.

The defendant also contends that the temporary conditions in place at the WCJ to manage the COVID-19 pandemic unduly interfere with his right to prepare his defense and require his immediate release. As an initial matter, accepting this argument would appear to require the wholesale release of inmates at the WCJ. *See also United States v. Guzman*, 20 Cr. 56 (PAC), 2020 WL 1700253, at *2 (S.D.N.Y. Apr. 8, 2020) (Crotty, *J.*) ("To accept the defendant's generalizations about impediments to access to counsel and argument that release is necessary, especially in a case where no trial, hearing, or briefing schedule has been set yet, would 'logically result in the wholesale release of pretrial inmates. The Court does not accept the proposition that such a result is either better for the inmate or for society more broadly.'" (quoting *United States v. Rudy Acosta*, 19 Cr. 848 (NRB), ECF Doc. No. 14 (S.D.N.Y. Mar. 25, 2020))). The Court should, like other courts in this District, reject the defendant's attempt to claim COVID-19 poses a risk to him in jail, and then use the mitigation efforts put in place by the WCJ to limit the spread of COVID-19 to suggest that they create circumstances that justify his release.

The defendant's arguments fail for further reasons. At the WCJ, all inmates have access to video visitation and phone services. Based on the posture of this case (*e.g.*, recent arrest, no trial date or hearing date and no motions scheduled), there is no unusually urgent need for Senior to consult with his lawyers. *See United States v. John Cicero*, No. 20 Cr. 125 (KMK) (S.D.N.Y. July 17, 2020) (Karas, *J.*) (rejecting similar argument about WCJ conditions warranting immediate release, denying bail appeal for narcotics defendant with no prior felony convictions and no evidence of firearm possession, and affirming detention decision); *United States v. Stephenson*, No. 19 Cr. 562-3 (KMK) (S.D.N.Y. Apr. 10, 2020) (Smith, *J.*) (rejecting similar argument about WCJ conditions warranting immediate release); *Decker*, No. 20 Cr. 104 (NSR) (S.D.N.Y. Apr. 8, 2020) (rejecting similar argument about WCJ conditions warranting immediate release, denying bail appeal, and affirming detention decision); *United States v. Mountain*, No. 09 Cr. 240 (CS) (S.D.N.Y. Apr. 6, 2020), ECF Doc. No. 24 at 2 (Seibel, *J.*) (rejecting similar argument about WCJ conditions warranting immediate release).

Judge Nathan's March 19, 2020 decision in *United States v. Stephens*, No. 15 Cr. 95-51 (AJN) (ECF No. 2798), on which the defendant relies, was premised on a combination of factors not present in this case, including the need to facilitate that defendant's preparation with defense counsel for an imminent hearing, and the fact that the primary evidence the Government relied upon in that case to establish that the defendant had possessed a firearm and posed a danger to the community was "undermined by new information not available to either party at the time of the [earlier detention] hearing." *Id*. at 2. In fact, Judge Nathan's order expressly avoided reaching the primary ground on which this defendant seeks temporary release – that is, the conditions in the relevant prison facility. Judge Nathan made no ruling whatsoever as to whether temporary release was warranted because of "the current public health crisis itself." *Stephens* at 6 n.3; *see also id*. ("The Court need not decide this additional factor here because its determination that release is necessary for the preparation of the Defendant's defense is sufficient under § 3142(i)."). Neither of the factors on which Judge Nathan based her ruling is present here. No new facts are alleged. There is no imminent hearing or trial, and the defendant has not claimed an actual failure to confer with his attorney.

Accordingly, Senior's argument regarding the conditions at the WCJ interfering with his right to prepare his defense and compelling his immediate release should be swiftly rejected by this Court.

### V.     **Conclusion**

For the reasons stated above, the Court should detain the defendant pending trial, as recommended by Pretrial Services.

<div style="margin-left:50%">

Respectfully submitted,

AUDREY STRAUSS
Acting United States Attorney

By: _s/_
Shiva H. Logarajah
Jacob Warren
David R. Felton
Adam Hobson
Assistant United States Attorneys
Southern District of New York
(914) 993-1918/(212) 637-2264/(914) 993-1908/(212) 637-2484

</div>

cc:   All Counsel of Record (by ECF and email)
      Pretrial Services (by email)